## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JERRY C. CONNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-CV-3268 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Jerry Conner appeals from a final decision of the Social

Security Administration (SSA) denying his application for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI) under

chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, and

1381a.  Conner brings this appeal pursuant to 42 U.S.C. § 405(g).  The

parties have consented to a determination of this case by the United States

Magistrate Judge, pursuant to 28 U.S.C. § 636.  Order, June 27, 2005 (d/e

13).  The parties have filed cross-motions for summary judgment or

affirmance pursuant to Local Rule 8.1(D).  Plaintiff's Motion for Summary

Judgment (d/e 11); Motion for Summary Affirmance (d/e 14).  For the

reasons set forth below, the Court determines that the SSA's decision is

supported by the law and the evidence.  The SSA's Motion for Summary

Affirmance is therefore allowed, and Conner's Motion for Summary

Judgment is denied.

<u>STATEMENT OF FACTS</u>

<u>A.</u>   <u>Medical History</u>

Conner is a 53-year-old male.  In March 2001, Conner was examined

by Dr. Steven Ray.  Conner informed Dr. Ray that, approximately one

month before, Conner injured himself picking up something in his yard.

Conner did not have a physician, and he saw a chiropractor for about a

month following the accident.  Conner reported that he had experienced

back pain in the past, but had not had any surgeries or hospitalizations.

Dr. Ray noted some tenderness along the medial scapula, but no

paraspinal tenderness in the lumbar area or tenderness over the bony

spine.  Dr. Ray noted that Conner had a fairly good range of motion at the

waist that was slightly limited due to pain.  An x-ray of Conner's spine

revealed severe arthritic changes of the cervical spine and mild arthritic

changes in the thoracic spine.  Dr. Ray diagnosed cervical and thoracic

disc disease and restricted Conner to light duty work, with no lifting over

five pounds and no sitting or standing over two hours.

Dr. Ray evaluated Conner one week later.  Conner continued to complain of burning pain between his shoulder blades.  Dr. Ray scheduled a magnetic resonance imaging (MRI) of Conner's neck for the following day based on the arthritic changes to the spine.  Dr. Ray noted that the disc spaces were fairly well maintained.  Dr. Ray modified Conner's work restrictions to exclude any repetitive motion, pushing, lifting or pulling. Dr. Ray restricted Conner to a sitting job only, but noted that Conner should be allowed to stand and walk every one to two hours.

Conner again saw Dr. Ray one week later.  Conner continued to complain of neck pain that radiated into his right arm.  Dr. Ray noted the MRI results which showed spondylosis at multiple levels in the cervical spine and a moderate degree of spinal stenosis.  Dr. Ray noted that Conner was constantly twitching his head and had a limited range of motion in his neck due to pain.  Dr. Ray referred Conner to Dr. Donald Pierson, a neurosurgeon, and continued Conner's restrictions at work.

Because Conner had only been symptomatic for a month, Dr. Pierson referred Conner to Advance Physical Therapy for local therapy with a trial of traction, range of motion, and exercises, together with a home program. Conner received six sessions of physical therapy.  The therapist noted that

Conner's symptoms had improved by 50 percent, but that Conner continued to have burning pain "in the left upper trap region."  A.R. at 131.

On May 7, 2001, Conner was reevaluated by Dr. Pierson.  Conner informed Dr. Pierson that his condition had not improved with therapy and may have become slightly worse.  Dr. Pierson scheduled Conner for an anterior cervical fusion, which was performed on June 5, 2001.  Conner had a follow-up appointment with Dr. Pierson on July 2, 2001.  Conner stated that he still was experiencing pain in his neck and arm.  From x-rays, Dr. Pierson noted "good placement of the fusion mass and good alignment with the plate."  A.R. at 169.  Dr. Pierson advised Conner that it sometimes took a while for symptoms to subside.

Connor again saw Dr. Pierson on August 13, 2001.  At this time Conner reported that he was still experiencing symptoms, particularly in his neck.  Dr. Pierson noted his opinion that at least some of Conner's radiculopathy had subsided.  According to Dr. Pierson, x-rays revealed "good position of the fusion mass, with good position of the plate."  A.R. at 169.  However, because Conner continued to experience symptoms, Dr. Pierson ordered a CT scan of his cervical spine.

On August 27, 2001, Conner saw Dr. Pierson again.  Dr. Pierson noted that the results of the CT scan showed moderate spur formation and degenerative disease scattered up and down Conner's spine.  Dr. Pierson opined that Conner's persistent neck pain resulted from arthritic or degenerative conditions.  The fusion appeared to be progressing satisfactorily, and Dr. Pierson saw no need for further surgery.  Dr. Pierson noted that Conner's symptoms had improved somewhat since his last appointment.  However, Dr. Pierson noted that Conner worked a fairly demanding job at DOT Foods.  As a result, Dr. Pierson determined that Conner should have three months off of work for convalescence and issued him an off-work slip.

Conner returned to see Dr. Pierson on September 10, 2001.  Conner reported that he was still experiencing significant neck pain.  Dr. Pierson noted that Conner wanted to see his primary physician about arthritic treatments or a referral to a rheumatologist.  Despite the fact that three months had passed since the surgery, Dr. Pierson decided that it was prudent to keep Conner off of work "for a while longer."  A.R. at 167.

Nearly two years later, Conner was examined by Dr. Phillip Budzenski, a consulting physician, at the request of state disability

examiners.  Dr. Budzenski's notes reveal that Conner informed him

> that about every other month he will have an exacerbation of
> back pain 'right at the center' of his back.  The pain does not
> travel.  He does not have any reticular symptoms or sensory
> loss.  He does note having a burning type sensation between
> his shoulders at times.  He notes that he can walk for 20
> minutes without flaring up his back.  He feels that he has
> trouble sitting longer than 3 to 4 minutes because of his neck
> pain.

A.R. at 172.  Conner also informed the doctor that he last worked full-time

approximately four months before the appointment.  Dr. Budzenski further

noted that Conner stated that he was "able to perform basic activities of

daily living."  Id. at 173.  Dr. Budzenski observed that Conner appeared

well-dressed and well-nourished and that he walked with a normal gait.

Dr. Budzenski noted that Conner could get onto and off of the exam table,

bend over to tie and untie his shoes, and squat, all without difficulty.

Dr. Budzenski observed that Conner was "stable at station" and appeared

comfortable in seated and supine positions.  Id.  With respect to Conner's

musculoskeletal examination, Dr. Budzenski noted upper thoracic kyphosis

with mild loss of normal lordosis and limited flexion, extension, left lateral

bend, and rotation.  In conclusion, Dr. Budzenski noted that Conner did not

have difficulty with being seated during the examination, but he did want "to

move his neck a lot as if he were trying to relieve a 'catch'."  Id. at 176.

On June 12, 2003, Dr. Stanley Burris, a state agency physician,
reviewed Conner's medical records and prepared a residual functional
capacity assessment.  Dr. Burris opined that Conner had the following
exertional limitations: occasionally lift and/or carry 50 pounds, frequently lift
and/or carry 25 pounds, stand and/or walk for about 6 hours in an 8-hour
work day, sit for a total of about 6 hours in an 8-hour work day, unlimited
pushing and/or pulling with the lift and/or carry weight restrictions.  A.R. at
197.  Dr. Burris noted no postural, manipulative, visual, communicative, or
environmental limitations.  Dr. P.A. Talcerkar reviewed the evidence and
affirmed Dr. Burris's opinions on August 26, 2003.

On August 5, 2003, Conner presented to the emergency room at Illini
Community Hospital, complaining of back pain that had become
progressively worse over the prior month.  The attending physician
prescribed Vioxx and instructed Conner to contact Dr. Dean "as needed if
not improved."  A.R. at 217.

On February 3, 2004, Conner was examined by Dr. A.J. Ansari as a
result of Conner's "long standing problem with back pain."  A.R. at 221.
Dr. Ansari noted that Conner reported experiencing

> occasional pain, especially when he exerts himself or bends
> down and then the back starts to hurt more.  Also occasionally,

> he would slip on ice and then the back gets tense.  Recently,
> he has been jerking his neck somewhat to try and relieve the
> discomfort, and complains of tenseness in the muscles, more
> so on the left side.

Id.  Conner further reported that the Vioxx was not helping.  Dr. Ansari's

examination revealed some tenseness of muscles on the right side of

Conner's neck.  Dr. Ansari noted an impression of "Back pain, arthritis,

cervical spine" and prescribed Flexeril and Ultracet for pain control.  Id. at

220.  Dr. Ansari conducted a follow-up on April 5, 2004.  Conner

complained that his pain remained and stated that he burned himself while

using a heating pad to administer heat therapy to the painful areas.  Dr.

Ansari opined that the combination of pain medication, therapy and muscle

relaxant was "not quite doing it."  Id. at 219.  Dr. Ansari referred Conner to

Dr. William Holt for a neurology assessment.  Id.

Dr. Holt examined Conner on April 8, 2004.  Conner complained of

neck and back pain.  Conner told Dr. Holt that since the surgery, his neck

has felt stiff and like it needs to pop.  Conner stated that he felt the same

type of chronic pain in his upper and lower back.  X-rays revealed a

narrowing in Conner's lumbar spine and other degenerative changes and

spurring up and down the spine.  Dr. Holt noted that Conner was not

complaining of radicular  pain in his arms or legs.  Dr. Holt informed Conner

that he would not help him with his neck and advised him to return to Dr. Pierson.  Dr. Holt did not see reason for further imaging studies in the absence of radicular pain.  Dr. Holt recommended that Conner quit smoking and prescribed a course of physical therapy.  Dr. Holt concluded, "This patient does not need my surgical services at this time."  A.R. at 224.

Conner underwent physical therapy on April  9, 13, and 14, 2004.  At the April 13, 2004 session, Conner reported that his middle back pain was improved and he was able to sleep better.  At the April 14, 2004 visit, Conner reported no pain in his middle back and stated that he did not feel that he needed physical therapy.  A.R. at 226.  Conner did not return to therapy after the April 14th visit.  On April 28, 2004, the Conner's therapist noted that his goals had been met.  Id.

B.    Administrative Hearing

Conner filed his application for DIB and SSI benefits on April 9, 2003.  His claim was denied initially and on reconsideration.  Conner requested an administrative hearing, which was held June 9, 2004.  The Administrative Law Judge (ALJ) heard testimony from Conner and vocational expert Robert Raschke.

Conner testified that he was 5' 8" tall and weighed 185 pounds.
Conner stated that he completed high school and then underwent training
at the police academy in Belleville, Illinois.  Conner testified that, prior to
1995, he had been employed as a law enforcement officer, first with the
Brown County Sheriff's Department and later with the Mount Sterling Police
Department.  Conner testified that, prior to September 17, 2001, he was
employed by DOT Foods for approximately five years as a dry warehouse
worker.  At DOT Foods, Conner was required to stack cases and lift up to
seventy-five pounds.  Conner stated that he left DOT Foods on September
17, 2001.

Conner stated that, at some point after he left DOT Foods, he was
employed as a warehouse worker at the Nature House for almost one year.
In his position at the Nature House, Conner was required to lift ten pounds
consistently and fifty pounds occasionally and to work with forklifts.  When
asked by the ALJ why he left the Nature House, Conner testified as follows:
"when I first started there it was full-time and I hurt my back and they put
me down on part-time.  And I just kept pulling muscles in my back and
there towards the end I'd missed some and they dismissed me."  A.R. at
281.  The ALJ then inquired what it was that was causing Conner to have

physical problems with the Nature House job.  Conner responded, "it's not as much to lifting as this time I pulled a muscle. I dropped some change on the floor and I reached down and there's times that I can sneeze and it just feels like a pitchfork in my back." Id.

With respect to his physical condition, Conner testified that he was unable to hold his neck in one place, stating that it gets weak and then stiffens up.  According to Conner, he had to keep popping and moving his neck every two to three minutes.  Conner stated that he had been this way since his surgery in June 2001.  Conner testified that his neck had become worse since the surgery.  He stated that he constantly experienced a dull pain in the lower part of his neck that would go down into his shoulders and start to burn.  At the time of his testimony, Conner rated his pain as a five on a ten-point scale, but noted that the longer he sat, the worse the pain became.

According to Conner, he could sit for about fifteen minutes before his back pain caused him to have to move.  He stated that he could walk around, but he found it difficult to stand in one place.  Conner testified that he could walk approximately "five blocks each way" over rough or uneven

ground.  A.R. at 276.  Conner testified that he could lift approximately ten

pounds, but he could not stoop or bend over.

Conner stated that his pain would radiate down his arms if he raised

his arms over his head or tried to hold them up in front of his body.  Conner

testified that when he drove, his hands would become numb if he placed

them on the steering wheel.  Conner compensated for this by driving with

one hand on the wheel at a time and alternating.  Conner stated that he

could drive for twenty to twenty-five minutes using this method.

Conner also described pain in his middle and lower back and stated

that he was able to sit for only fifteen to twenty minutes without pain.

Conner testified that he had problems dressing himself, especially putting

on his socks.  Conner testified that he had problems combing his hair.

Conner stated that he had difficulty getting in and out of high riding

vehicles, like trucks.  Conner also stated that he was typically awakened

three of four times a night by back and neck stiffness and pain.

Conner testified that he lived alone in a one-bedroom apartment.

According to Conner, he was unable to accomplish basic things around the

house, like washing dishes, without his back beginning to hurt.  Conner

explained that he would do housework in approximately fifteen minute

intervals, accomplishing as much as he could before his back began to hurt.  Conner testified that his mother did his laundry for him.  Conner explained that he did little during the day.  He stated that he would watch television and maybe walk outside for a little bit.  He testified that he was unable to eat in restaurants because of his problem remaining seated for long periods.  He stated that he would, however, pick up meals at restaurant drive-throughs.  Conner testified that he would attend church, but that he would often stand up during the service when his back began to hurt.  Conner testified that his doctor had given him a prescription for hydrocodone for pain, but Conner stated that he had to let the prescription lapse because he lacked medical insurance or a Medicaid card.  Conner further stated that he experienced headaches two or three times a week, which forced him to take aspirin and lie down.

With respect to his psychological condition, Conner testified that his neck problem has caused him to experience a concentration problem.  If Conner's neck tightens up when he is reading or watching television, Conner testified that he has to get up and walk away from his activity.  Conner also stated that he tended to become upset, embarrassed, and discouraged when people mentioned his neck movement.  According to

Conner, his sleep was sometimes disturbed by this psychological turmoil.
Conner also stated that he had a problem with depression and, as a result,
he stayed in bed all day "[m]aybe once a week."  A.R. at 273.

Vocational expert Raschke testified that Conner's past relevant work
as a warehouse worker was considered "2 and medium" and the work as a
law enforcement officer was considered "6 and medium."  A.R. at 284.  The
ALJ presented Raschke with a hypothetical of an individual who was of the
same age, education, background and experience as Conner.  The ALJ
asked Raschke to assume that the individual was capable of light level
exertion with the following limitations: ability to change position more or
less at will, next to no overhead work using the arms, no fixed head or neck
positioning for long periods of time, no ladders or scaffolds, and a mild
limitation on concentration, pace, and persistence resulting in 85 percent
efficiency throughout the day.  Raschke ruled out Conner's past work in
such a situation, noting that warehouse work in the general labor market
would require medium exertion.  Raschke, however, testified that the
hypothetical individual could perform work as a general security or gate

guard, filter assembler, or a packing line worker, all of which he believed existed in significant numbers in the economy.

The ALJ then modified the hypothetical to decrease the individual's productivity to 66 percent based on a moderate limitation on concentration, pace, and persistence.  Raschke responded that he would not consider such a person to be competitive.  Raschke opined that such an individual would almost fall in the level of sheltered workshop based on the fact that he could not identify an employer who would allow an individual to be off-task for up to a third of the workday.

C.    The ALJ's Decision

The ALJ issued his decision on July 28, 2004, concluding that Conner was not disabled under the Social Security Act.  In reaching this conclusion, the ALJ followed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920.  The analysis requires a sequential evaluation of (1) whether claimant is engaged in substantial gainful activity; (2) the severity and duration of claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents claimant from doing his past relevant work; and (5) whether claimant can perform other work, given his residual functional capacity,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the person can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ determined that Conner was performing substantial gainful work until April 1, 2003, based on his job at the Nature House.  Thus, the ALJ concluded that Conner's claim failed at step one for the period from the alleged onset until April 1, 2003.  For the period beginning April 1, 2003, the ALJ determined that Conner met his burden on the first two steps of the analysis, but concluded that Conner failed to demonstrate that his impairment was severe enough to equal an impairment listed on Appendix 1.  A.R. at 17.  The ALJ then considered whether Conner retained the residual functional capacity to perform his past relevant work (step four) or other work existing in significant numbers in the national economy (step five).  Id.  The ALJ concluded that Conner retained the residual functional capacity to perform "a wide range of light work activity."  Id. at 18.  In

assessing Conner's residual functional capacity, the ALJ recognized that Conner's degenerative disc disease was well-documented. The ALJ noted that Conner was nevertheless able to work for two years after his surgery, with no subsequent reported injuries. The ALJ noted that reporting physicians indicated that Conner retained the residual functional capacity for light to medium exertional activity. The ALJ found Conner's statements regarding his symptoms and limitations to be "minimally credible" and gave them "little weight." Id. Specifically, the ALJ stated

> The testimony of record establishes that the claimant lives by himself receiving no assistance with activities of daily living. The claimant lost his job because he was fired, not because he was unable to perform the physical requirements of the work. The claimant testified that he has not even looked for other, less strenuous, work even though he has significant law enforcement experience which imparted transferable skills. As noted by Dr. Budzenski, the claimant had no difficulty staying seated during the examination, despite his claimed limitation to sitting for merely 3 to 4 minutes at a time.

Id.

The ALJ found that Conner's past work required medium exertional activity; thus, Conner met his burden through step four and the ALJ correctly shifted the burden to the Commissioner to show that Conner retained the residual functional capacity to perform other work existing in significant numbers in the national. Id. Based on the vocational expert's

testimony, the ALJ determined that Conner could work as a security

worker/gate guard, assembly bench work/filter assembly, and packer.  The

ALJ determined that each of these positions existed in a significant number

in the national economy.  Thus, the ALJ deemed Conner to be "not

disabled" at step five.

D.    The Appeals Council

Conner appealed the ALJ's decision to the SSA Appeals Council.

Conner's attorney submitted a brief memorandum arguing that the ALJ's

decision was against the weight of the evidence.  A.R. at 255-57.  On

November 19, 2004, the Appeals Council denied Conner's request for

review.  A.R. at 6-8.  The Appeals Council stated that it considered the

reasons Conner disagreed with the ALJ's decision, but found  no basis for

reversing the ALJ's decision.  Conner filed his Complaint (d/e 2) in the

present case on December 15, 2004, together with a Motion to Proceed in

forma Pauperis (d/e 1) which the Court allowed by Text Order dated

December 20, 2004.

## ANALYSIS

This Court reviews the ALJ's decision to determine whether it is

supported by substantial evidence.  Substantial evidence is, "such relevant

evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ further must at least minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).   The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Conner seeks reversal based on his assertion that the ALJ improperly discredited Conner's testimony regarding his ability to function despite the fact that medical records corroborated his allegations of pain. As a result, Conner contends that the ALJ overstated his residual functional capacity.  Conner notes that the vocational expert expressly opined that no jobs existed for an individual in Conner's situation who could perform at only 66 percent efficiency.

Ordinarily, a reviewing court defers to an ALJ's credibility determination.  Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). The general rule is that absent legal error, an ALJ's credibility finding will

not be disturbed unless "patently wrong."  Powers v. Apfel, 207 F.3d 431,

435 (7th Cir. 2000).  An ALJ, however, may not disregard a claimant's

subjective complaints merely because they are not fully supported by

objective medical evidence, but may discount subjective complaints that

are inconsistent or conflicting with the evidence as a whole.  Knight v.

Chater, 55 F.3d 309, 314 (7th Cir. 1995).  When assessing a claimant's

credibility, the ALJ must consider the degree to which a claimant's

allegations of pain and other symptoms are consistent with medical signs,

laboratory findings, diagnoses, and opinions by treating or examining

physicians and other medical sources and must explain adequately the

reasons behind the credibility finding.  See Brindisi v. Barnhart, 315 F.3d

783, 787 (7th Cir. 2003).

In the instant case, the ALJ considered the degree to which Conner's

allegations of pain were consistent with medical findings and opinions.  The

ALJ noted that reporting physicians indicated that Conner possessed a

residual functional capacity for light to medium exertional activity and that

Dr. Budzenski specifically noted that Conner had no difficulty remaining

seated during the examination, despite his claimed 3 to 4 minute limit on

sitting.  Moreover, the ALJ expressly noted several instances in which

Conner's subjective complaints were inconsistent with the evidence as a
whole.  The ALJ noted that Conner was able to meet his daily needs
without assistance.  The ALJ further noted that Conner was fired from the
Nature House job and did not leave the job based on an inability to perform
the physical requirements of the work.  In his Motion for Summary
Judgment, Conner asserts that the record evidence shows that he was
fired from the Nature House because he could not perform the job.  Motion
for Summary Judgment, p. 5.  Conner points to his testimony at the
administrative hearing, which is the only evidence on point.  As set forth
above, Conner testified that he was fired because he missed work.  A.R. at
281.  When the ALJ specifically inquired as to Conner's physical problems
with the job, Conner failed to identify any.  Conner instead stated that he
pulled muscles easily, once when he picked up some change he had
dropped.  Conner also stated that he felt intense back pain when he
sneezed.  Id.  Therefore, the ALJ did not err in discounting Conner's
subjective complaints of pain.  Moreover, the Court notes that in assessing
Conner's residual functional capacity, the ALJ incorporated some
restrictions based on Conner's subjective complaints, including the need to

change positions frequently and a substantial restriction in overhead use of the arms.

Additionally, the ALJ's decision that Conner retained the residual functional capacity to perform some type of gainful employment that exists in the national economy is supported by the evidence.  The ALJ determined that Conner retained the ability to perform light work activity with the following additional restrictions: the need to change positions frequently, at will, with substantial restriction in overhead use of the arms, looking up, fixed head or neck positions for extended periods; preclusion from climbing ladders or scaffolding; and mild limitation in concentration, persistence, and pace.  The ALJ noted that Conner was closely approaching advanced age under the SSA  and found that Conner was capable of making a vocational adjustment to other work.  This assessment is consistent with the record evidence as set forth above.

The vocational expert testified that an individual with the described limitations who functioned at 85 percent efficiency could perform work as a general security or gate guard, filter assembler, or a packing line worker, all

of which are classified as light, unskilled positions.[1]  As Conner correctly points out, the vocational expert opined that such an individual would not be employable if the productivity was decreased to only 66 percent. However, as set forth above, the ALJ did not err in discounting Conner's subjective complaints.  In assessing Conner's residual functional capacity, the ALJ determined that Conner suffered only a mild limitation in concentration, persistence, and pace.  This finding is supported by the evidence as a whole.  Thus, the vocational expert's opinion regarding the employability of an individual who was limited by concentration, persistence, and pace to 66 percent productivity is immaterial.

THEREFORE, the Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) is ALLOWED.  The Plaintiff Jerry Conner's Motion for Summary Judgment (d/e 11) is DENIED.  The decision of the Commissioner of Social Security is AFFIRMED.  All pending motions are denied as moot.  This case is closed.

---

[1]Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C.F.R. § 404.1568(a).  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).

IT IS THEREFORE SO ORDERED.

ENTER:   June 15, 2006.

FOR THE COURT:

s/ Byron G. Cudmore

_____
BYRON G. CUDMORE
UNITED STATE MAGISTRATE JUDGE